[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Snodgrass v. Testa*, Slip Opinion No. 2015-Ohio-5364.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2015-OHIO-5364

SNODGRASS,[1] AUD., APPELLEE AND CROSS-APPELLANT, *v.* TESTA, TAX COMMR., APPELLEE AND CROSS-APPELLEE; MARTIN MARIETTA ENERGY SYSTEMS, INC., N.K.A. LOCKHEED MARTIN ENERGY SYSTEMS, INC., APPELLANT AND CROSS-APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Snodgrass v. Testa*, Slip Opinion No. 2015-Ohio-5364.]

*Taxation—Personal property tax—Petition for reassessment—Standing to appeal as an aggrieved party from a decision of the Board of Tax Appeals— Board of Tax Appeals lacked statutory authority to address allegations that county auditor issued assessment frivolously and in bad faith—R.C. 5711.31—Tax commissioner has statutory authority to cancel an auditor's assessment—R.C. 5711.01(B)—Definition of "taxpayer"—Assessed party*

---

[1] The former Pike County auditor, Teddy L. Wheeler, issued the tax assessment challenged in this case, and our previous rulings in this case on motions and other matters were captioned *Wheeler v. Testa* when they were announced. However, Wheeler's term as county auditor ended in March 2015. Accordingly, the current Pike County auditor, Erica Snodgrass, is automatically substituted as a party to this action in place of the former auditor. *See* App.R. 29(C)(1).

*must qualify as a taxpayer to be required to pay personal property tax—*
*Board of Tax Appeals' decision affirmed.*

(No. 2014-1362—Submitted September 15, 2015—Decided December 24, 2015.)

APPEAL and CROSS-APPEAL from the Board of Tax Appeals, No. 2012-2043.

_____

KENNEDY, J.

{¶ 1} This is an appeal and cross-appeal from a decision of the Board of Tax Appeals ("BTA") that affirmed the tax commissioner's cancellation of a December 23, 2010 assessment of personal property tax issued by appellee and cross-appellant, the Pike County auditor, against appellant and cross-appellee, Martin Marietta Energy Systems, Inc., n.k.a. Lockheed Martin Energy Systems, Inc. (hereafter both referred to as "LMES"), for tax year 1993. Although LMES prevailed before the BTA by obtaining cancellation of the assessment, it prosecuted its appeal to this court based on the BTA's failure to address its contentions that the auditor issued the assessment frivolously and in bad faith. The county auditor's cross-appeal goes to the core issue of this case: the propriety of the assessment.

{¶ 2} The parties advance numerous propositions of law, including a threshold challenge raised by the auditor to the propriety of LMES's appeal. For the reasons that follow, we hold that LMES had standing as an aggrieved party to prosecute its appeal to this court, thereby establishing this court as the forum for this case under R.C. 5717.04, to the exclusion of the Fourth District Court of Appeals. On the merits of LMES's appeal, we hold that the BTA lacked the authority to make a finding of frivolous conduct or bad faith by the auditor with respect to the assessment that was placed before it through the appellate process. We also decline to grant LMES's request that we make a finding that the auditor acted in bad faith or engaged in frivolous conduct.

2

{¶ 3} As for the auditor's cross-appeal, we hold that the tax commissioner properly canceled the assessment, as affirmed by the BTA, because we conclude that LMES was never shown to qualify as a "taxpayer" as that term is statutorily defined for purposes of the personal property tax. We do not address the other possible grounds for canceling the assessment.

{¶ 4} In light of these holdings, we affirm the decision of the BTA.

## I. FACTS AND PROCEDURAL HISTORY

### A. BACKGROUND

{¶ 5} The Portsmouth Gaseous Diffusion Plant located at Piketon in Pike County ("the Piketon plant") was developed as a uranium-enrichment facility by the United States Atomic Energy Commission, and from the mid-1950s forward the plant was owned by the federal government but operated by private contractors. In 1977, the United States Department of Energy ("DOE") was created and assumed authority over the plant. In 1986, LMES became the contractor that conducted the operations at the site, taking over in that capacity from Goodyear Atomic Corporation.

{¶ 6} At issue in this appeal is a personal-property-tax assessment for tax year 1993 against LMES. That is the first of 45 assessments the Pike County auditor issued against Goodyear Atomic Corporation and LMES pertaining to tax years 1955 through 1999.[2] The county auditor issued the assessment at issue here on December 23, 2010.

### B. THE FEDERAL GOVERNMENT OWNED THE PROPERTY, AND LMES USED IT

{¶ 7} The evidence presented before the BTA is voluminous. It includes the hearing testimony of the county auditor who issued the assessment, the contract of more than 180 pages between the DOE and LMES that covered the

---

[2] The personal property tax was phased out through tax-reform legislation enacted in 2005, s*ee* R.C. 5711.22(E) through (G), Am.Sub.H.B. No. 66, 151 Ohio Laws, Part III, 4436-4437, but that legislation does not apply to the assessment at issue in this case.

management and operation of the plant during the tax year at issue, and the hearing depositions of three persons with knowledge of LMES's operation of the Piketon plant: a retired government-contracting officer, a retired contract negotiator who had worked for LMES, and a retired LMES employee who had managed the Piketon plant. The most significant established fact for this appeal, stipulated by the auditor to be accurate, is that all the tangible property at the plant was titled to the federal government. The former plant manager testified that the contract specified that "all the land, the buildings, the equipment, even the pens and pencils were property of the U.S. government," an assertion confirmed by other witnesses. The contract's government-property clause specifically provided for the contractor to be reimbursed by the government for any property acquired and provided that title to the property passed directly from the vendor to the government.

{¶ 8} Although the DOE owned the personal property, the contract gave LMES possession, custody, and control of that property. The contract required LMES to keep detailed records of the government-owned property, which was tagged and tracked, and to follow the DOE's directions in disposing of any worn-out or surplus property.

{¶ 9} Another important contract provision was the organizational-conflicts-of-interest clause, which, according to the retired LMES contract negotiator, "required an arm's length relationship between the entity performing the contract * * * and the parent corp[orate] organization," to the extent that "we couldn't permit staff from the corporate entity or its affiliates to come onsite. We couldn't share data with them." He also stated that the government-property clause in conjunction with the conflict-of-interest clause "created a fence around the facility so that it was very clear that the operation was solely for the purpose of performing the contracts at the ongoing direction of the Department of Energy." In sum, according to the LMES negotiator, the DOE structured the

contract so that the contractor was "*a legal entity with really no financial background, no capital assets*, basically a talent pool to come in and manage" the plant. (Emphasis added.)

**{¶ 10}** LMES was paid a base fee under the contract plus a facility-specific "award fee" determined by the DOE based on LMES's performance using both subjective and objective criteria. All the profits realized by LMES resulted from the fees paid under the contract; LMES did not profit in any way from the DOE's sales of the plant's product. Moreover, the contract expressly forbade the use of any DOE property for any purpose other than performing obligations under the contract.

### C. THE DOE WAS AN INDEMNITOR FOR STATE AND LOCAL TAX CLAIMS AND ENTERED INTO A PAYMENT-IN-LIEU-OF-TAX AGREEMENT WITH LOCAL OFFICIALS

**{¶ 11}** The contract between the DOE and LMES also provided that LMES would notify the DOE of any attempt by state or local authorities to collect taxes and would be subject to the directions of the DOE regarding the nonpayment or payment under protest of taxes, with the understanding that the DOE would be granted any right to contest the taxes and would hold the contractor harmless as to them.

**{¶ 12}** Pursuant to federal statutes, the DOE was authorized to enter into payment-in-lieu-of-tax ("PILOT") agreements with local governments for federally owned real and personal property. The tax year assessed here, 1993, was the subject of a PILOT agreement entered into in 1998 covering tax years 1992 through 1997. The PILOT agreement provided for a single payment of $175,546.83 for the six years covered, an average of $29,257.80 a year. The PILOT agreement's stated reason for the DOE's "payment in lieu of property taxes for County government purposes" was to replace "ad valorem tax revenue"

that was foregone because the United States owned the Piketon plant. The agreement also stated:

> Such payment shall constitute full satisfaction of any and all claims the County may have for taxes for tax years 1992 through 1997 against DOE and DOE's contractors, of any nature whatsoever, on, with respect to, or measured by the value or use of Government-owned real *or personal property* which is utilized in carrying on activities of DOE.

(Emphasis added.)

{¶ 13} An exhibit to the PILOT agreement recognized LMES as one of the DOE's contractors. The preamble to the agreement identified the parties as the United States of America, represented by the Secretary of the Department of Energy, and Pike County, Ohio, stated to be a "duly constituted local taxing authority of the State of Ohio." The agreement was signed for the federal government by a contracting officer acting as an agent of the secretary of energy and for Pike County by the chairperson of the Pike County Board of Commissioners. Although the county auditor played a significant role in negotiating the PILOT agreement, neither the auditor nor the county treasurer signed or were identified as parties to the PILOT agreement executed in 1998.

### D. COURSE OF PROCEEDINGS

{¶ 14} For many years, the taxing authorities in Ohio regarded personal property owned by the federal government and used by its contractors as not subject to taxation. In 1958, the tax commissioner issued County Auditor Bulletin No. 126, in which he informed the county auditors that in Ohio, "personal property taxes could not be assessed against persons in possession of [federal] government property." This announcement was specifically based on a written

opinion of the Ohio attorney general that the tax commissioner had requested on the subject. *See* 1958 Ohio Atty.Gen.Ops. No. 2471, syllabus. But in 2010, an administrator of the Ohio Department of Taxation, in written correspondence on the department's letterhead, stated the "conclusion that the [federal government's] personal property is subject to taxation and should have been listed for taxation by the contractor, i.e. the manufacturer operating the [Piketon plant]." The county auditor then took action based in large part on this conclusion.

{¶ 15} On December 23, 2010, the auditor issued a "preliminary assessment certificate of valuation" for tax year 1993, naming LMES as the taxpayer and stating the "amended value" of the personal property determined to be subject to taxation as $158,512,000. The auditor explained at the BTA hearing that the number was determined by taking personal-property values from a document he had obtained from the DOE in 1992 through a request under the federal Freedom of Information Act. The auditor applied a depreciation rate of 30 percent, then he used an assessment multiplier of 25 percent to arrive at the taxable value. The total amount of delinquency for 1993 was calculated to be $23,244,789, consisting of $7,513,468 in unpaid tax, $3,756,734 in penalty, and $11,974,587 in pre-assessment interest.

{¶ 16} The auditor never obtained or reviewed any of LMES's books or records in making the assessment, and the parties have stipulated that none of the assessed property was listed on any of LMES's books and records.

{¶ 17} After receiving the assessment, LMES filed a petition for reassessment challenging the levy of personal property tax. The tax commissioner issued a final determination that canceled the assessment on the primary ground that it was barred by the PILOT agreement. In the alternative, the tax commissioner concluded that the assessment could not be presumed correct and could not be affirmed because it was not based on a reliable listing of

personal property and because the assessment lacked sufficient methodology to support the auditor's calculation of the property's value.

{¶ 18} The county auditor appealed to the BTA, and LMES filed a cross-appeal. During the course of the proceedings, the BTA granted the auditor's motion to dismiss LMES's cross-appeal.

{¶ 19} The BTA issued its decision on August 7, 2014. First, the BTA rejected the auditor's contention that the tax commissioner's statutory authority to "correct" assessments does not include the authority to cancel an assessment. The BTA read the relevant statutes, R.C. 5703.05 and 5711.31, to authorize the commissioner to "take whatever action is necessary to correct any errors made, including cancellation." BTA No. 2012-2043, 2014 Ohio Tax LEXIS 3770, *5 (Aug. 7, 2014). Next, the BTA relied on the definition of "taxpayer" in R.C. 5711.01(B) and on *Refreshment Serv. Co. v. Lindley*, 67 Ohio St.2d 400, 403, 423 N.E.2d 1119 (1981), to hold that LMES did not qualify as a "taxpayer" because it did not own or have a beneficial interest in the personal property at issue. *Id*. at *5-8.

{¶ 20} Third, the BTA considered and rejected the auditor's claim that LMES was liable to list and pay tax on manufacturing machinery and equipment at the Piketon plant under the theory that it was a "manufacturer" under R.C. 5711.16. The BTA held that LMES's "restricted relationship with the DOE" meant that it was the DOE, not LMES, that met the statutory definition of a manufacturer. *Id*. at *9-10.

{¶ 21} Additionally, the BTA held that the PILOT agreement barred the assessment, as did, in the BTA's view, the ten-year statute of limitations of R.C. 5703.58.

E. **COMPETING APPEALS TO THIS COURT AND TO THE COURT OF APPEALS**

{¶ 22} After the BTA issued its decision on August 7, 2014, LMES filed its appeal in this court the next day. On August 22, 2014, this court referred the

case to mediation. While the case was in mediation, LMES filed an amended notice of appeal.

{¶ 23} After the case was returned to the regular docket, the county auditor moved this court to dismiss LMES's appeal on the ground that LMES lacked standing because it was not aggrieved by the BTA's decision. We denied the motion on November 19, 2014. 140 Ohio St.3d 1505, 2014-Ohio-5098, 19 N.E.3d 923.

{¶ 24} On September 5, 2014, the auditor filed a cross-appeal in this court. On that same date, the auditor filed a notice of appeal in the Fourth District Court of Appeals. *See Wheeler v. Testa*, 4th Dist. Pike No. 14CA853, 2015-Ohio-188, ¶ 3. LMES moved the Fourth District to dismiss the appeal to that court on the ground that it was jurisdictionally barred by the first-filed-appeal rule of R.C. 5717.04. The Fourth District granted LMES's motion to dismiss, concluding that "LMES properly and timely first filed a notice of appeal in the Supreme Court of Ohio, thereby invoking that Court's exclusive jurisdiction." *Id*. at ¶ 11. The auditor has appealed that dismissal to this court in case No. 2015-0584. We accepted the auditor's appeal and held that case for decision in this case. 143 Ohio St.3d 1477, 2015-Ohio-3958, 38 N.E.3d 900.

## II. ANALYSIS

### A. ISSUES PRESENTED BY LMES'S APPEAL

#### 1. *The BTA did not address LMES's claims that the auditor engaged in frivolous conduct and acted in bad faith*

##### *a. LMES was aggrieved by the BTA's failure to address its claims*

{¶ 25} The auditor, as he did in the motion to dismiss that we denied, contends that LMES lacks standing as an aggrieved party to file an appeal to this court. We disagree.

{¶ 26} A party must be aggrieved by a decision of the BTA in order to appeal to this court. *See Newman v. Levin*, 116 Ohio St.3d 1205, 2007-Ohio-

5507, 876 N.E.2d 960, ¶ 3 (dismissing the tax commissioner's attempted appeal from a BTA decision affirming the commissioner's own determination because "none of the persons named by [R.C. 5717.04] has standing to appeal unless that person has been aggrieved by the decision of the BTA from which appeal is taken"). LMES's notice of appeal filed in this court explicitly concedes that it "does not contest the BTA's decision with respect to any of its stated reasons for affirming the Commissioner." That notice of appeal goes on to state that LMES "raised before the BTA numerous dispositive legal and jurisdictional issues that should have been part of the BTA's Decision."

{¶ 27} LMES's first three claims of error in its notice of appeal in this court address the BTA's failure to make findings of bad faith and frivolous conduct by the auditor and its failure to award sanctions for that conduct—claims that LMES clearly asserted before the BTA. "Aggrieved means deprived of legal rights or claims." *Cononi v. Mikhail*, 2d Dist. Montgomery No. 8161, 1984 WL 5419, *6 (Jan. 10, 1984), citing *In re Annexation in Mad River Twp., Montgomery Cty.*, 25 Ohio Misc. 175, 176, 266 N.E.2d 864 (C.P.1970); *see also Black's Law Dictionary* 80 (10th Ed.2014) (defining "aggrieved" as "having legal rights that are adversely affected"). LMES asserted a legal right to findings of bad faith and frivolous conduct from the BTA, and the BTA did not make those findings. By appealing the BTA's failure to do so, LMES plainly asserts the deprivation of a legal right, and LMES therefore establishes its standing to appeal.[3] Accordingly, we again decline to dismiss LMES's appeal.

---

[3] It is unnecessary to evaluate LMES's standing under any of the other asserted grounds for relief set forth in the notice of appeal, because the notice "advances at least one cognizable claim," and the appeal is therefore not subject to dismissal. *Ohio Apt. Assn. v. Levin*, 122 Ohio St.3d 1231, 2009-Ohio-3477, 911 N.E.2d 906, ¶ 6.

*b.  The auditor has not shown that the BTA's dismissal of LMES's*
*cross-appeal affects our jurisdiction*

{¶ 28} At oral argument, the auditor's counsel suggested that our jurisdiction is limited because the BTA dismissed the cross-appeal that LMES had filed in the BTA from the tax commissioner's determination.  This undeveloped argument refers to the order issued by the BTA on March 28, 2013, in which it granted the auditor's motion to dismiss LMES's cross-appeal and denied a motion filed by LMES to dismiss the auditor's appeal.  BTA Nos. 2012-A-2043 and 2012-A-2323, 2013 WL 1560492 (Mar. 28, 2013).  In dismissing LMES's cross-appeal, the BTA explained that LMES had raised numerous claims of error that merely asserted additional reasons why the tax commissioner should have canceled the assessment, *id*. at *3, and it pointed out in a footnote that the dismissal of the entire cross-appeal rendered "the auditor's motion to dismiss specifications of error nos. 19-21 moot," *id.* at *4, fn. 1.  Those specifications of error were the ones in which LMES asserted that the auditor had acted in bad faith and engaged in frivolous conduct by issuing the assessment.  By implication, the auditor's counsel's argument, if accepted, might preclude our exercise of jurisdiction over any of the issues raised by LMES before the BTA as alternative grounds for affirming the cancellation of the assessment.

{¶ 29} But the auditor has not established that the BTA's dismissal order has any effect on our jurisdiction.  The auditor cites no authority for the proposition that LMES's cross-appeal to the BTA was necessary to preserve the issues LMES advanced before the BTA, and the BTA clearly regarded the cross-appeal as jurisdictionally insignificant:  the BTA proceeded to consider alternative grounds to those relied on by the tax commissioner for canceling the assessment, and those alternative grounds were raised in the cross-appeal that the BTA had dismissed.

**{¶ 30}** Although a party that appeals from a final determination of the tax commissioner must identify its claims of error, neither the former nor current version of R.C. 5717.02 requires an appellee to file a notice of appeal to raise issues before the BTA. Moreover, the BTA's review of final determinations is de novo. *See Key Servs. Corp. v. Zaino*, 95 Ohio St.3d 11, 16, 764 N.E.2d 1015 (2002) (holding that "[t]he BTA hearing is *de novo*," that the BTA is "statutorily authorized to conduct full administrative appeals in which the parties are entitled to produce evidence in addition to that considered by the Tax Commissioner," and that the BTA has authority to "ascertain further facts and make its own findings independent of those of the Tax Commissioner"); *see also MacDonald v. Shaker Hts. Bd. of Income Tax Rev.*, ___ Ohio St.3d ___, 2015-Ohio-3290, ___ N.E.3d ___, ¶ 21.

**{¶ 31}** The auditor has not met his burden to present a full argument on this point, and "it is not generally the proper role of this court to develop a party's arguments." *In re Application of Columbus S. Power Co.*, 129 Ohio St.3d 271, 2011-Ohio-2638, 951 N.E.2d 751, ¶ 19. We therefore follow the BTA's lead and regard the BTA's dismissal of LMES's cross-appeal as jurisdictionally insignificant.

### c. The BTA lacked statutory authority to address claims that the assessment under review was issued frivolously and in bad faith

**{¶ 32}** LMES cites three cases in support of its contention that the BTA should have made a finding of frivolous conduct and bad faith on the auditor's part: *Oberlin Manor, Ltd. v. Lorain Cty. Bd. of Revision*, 69 Ohio St.3d 1, 629 N.E.2d 1361 (1994), *Health Care REIT, Inc. v. Cuyahoga Cty. Bd. of Revision*, 140 Ohio St.3d 30, 2014-Ohio-2574, 14 N.E.3d 1009, and *Salem Med. Arts & Dev. Corp. v. Columbiana Cty. Bd. of Revision*, 82 Ohio St.3d 193, 694 N.E.2d 1324 (1998). None of these decisions establishes a right to the kind of relief sought here. *Oberlin Manor* involved no request to the BTA for sanctions, but a

request only to this court—and we denied the request. *Id*. at 3-4. *Health Care REIT* likewise involved a request for sanctions made to this court—for the filing of an allegedly frivolous appeal here—and the request was denied. *Id*. at ¶ 72-75. *Salem Med. Arts* involved a claim for sanctions for discovery violations; this court ordered the BTA to consider on remand whether sanctions should be imposed. *Id*. at 195-197.

**{¶ 33}** To be sure, our decision in *Salem Med. Arts* does recognize the authority of the BTA to make a finding of bad faith and award sanctions in the context of discovery during proceedings that occur before the BTA. But something completely different is being requested here: LMES argues that the BTA should have found frivolous conduct and bad faith not in the conduct of a litigant before the BTA but in the auditor's issuance of the assessment.

**{¶ 34}** We have often pointed out that the BTA is a creature of statute whose powers are limited to those conferred by statute. *See, e.g.*, *Steward v. Evatt*, 143 Ohio St. 547, 56 N.E.2d 159 (1944), paragraph one of the syllabus; *Delaney v. Testa*, 128 Ohio St.3d 248, 2011-Ohio-550, 943 N.E.2d 546, ¶ 20. It is one thing to postulate that an administrative tribunal has an inherent authority to control the conduct of litigation before it; it is quite another to ask this court to accord to the BTA a power that is not set forth in the enabling statutes.

**{¶ 35}** R.C. 5717.03(F) confers upon the BTA the authority to "affirm, reverse, vacate, modify, or remand the tax assessments, valuations, determinations, findings, computations, or orders complained of in the appeals determined by the board." No statute confers upon the BTA the authority to find bad faith or frivolous conduct nor does any statute confer the power to impose sanctions on the party whose decision is under review *based on the nature of the decision appealed from*. Moreover, the tax commissioner's reassessment authority pursuant to R.C. 5711.31 encompasses "mak[ing] corrections to the

assessment, as the commissioner finds proper" but that statute makes no mention of finding bad faith or imposing sanctions.

{¶ 36} As an alternative, LMES requests that this court itself make a finding that the county auditor's assessment was frivolous and issued in bad faith. However, having just held that the BTA could not properly entertain the claims of frivolous conduct and bad faith, we are reluctant to exercise our revisory jurisdiction under Article IV, Section 2(B)(2)(d) of the Ohio Constitution in such an expansive manner, and we decline to do so. We note that our own rule regarding frivolous actions focuses on conduct in connection with litigating the appeal, *see* S.Ct.Prac.R. 4.03(A), and prudence counsels that we refrain from resolving issues that might more properly be addressed in another forum in a different proceeding. We therefore decline to consider whether the auditor issued the assessment frivolously and in bad faith.

**B. ISSUES PRESENTED BY THE AUDITOR'S CROSS-APPEAL**

*1. R.C. 5711.31 conferred authority on the tax commissioner to modify the auditor's assessment by finding it unlawful and canceling it entirely*

{¶ 37} Turning to the auditor's cross-appeal, the auditor has consistently argued throughout this litigation that the tax commissioner's authority upon the filing of a petition for reassessment under R.C. 5711.31 is limited to modifying the assessed value or making other factual adjustments and does not extend to cancellation of the assessment in its entirety. We disagree. R.C. 5711.31 explicitly confers authority to "make corrections to the assessment, as the commissioner finds proper," and the power to cancel an improper assessment constitutes a type of correction. Nothing in the statute limits the authority to "make corrections" in a way that prevents the commissioner from finding that the assessment was unlawful; instead, the statute's phrasing implies that power. It follows that the tax commissioner's authority on reassessment encompasses canceling the assessment on the ground that it was not lawfully issued. The

reassessment procedure is remedial, and a remedial statute is to be construed broadly to effectuate its purpose. *See Sheldon Rd. Assocs., L.L.C. v. Cuyahoga Cty. Bd. of Revision*, 131 Ohio St.3d 201, 2012-Ohio-581, 963 N.E.2d 794, ¶ 27, quoting *Stephan v. Daniels*, 27 Ohio St. 527, 536 (1875) ("a provision passed for the purpose of 'protecting the citizen from illegal exactions' was 'remedial in its character' and 'should receive that construction, if the words will reasonably admit, that will effect the manifest intention of the legislature, and remedy the evil' ").

**2. Because LMES does not qualify as a "taxpayer" under R.C. 5711.01(B), the assessment was unlawful**

*a. The auditor erroneously argues that LMES qualified as a "manufacturer" and that it did not need to separately qualify as a "taxpayer"*

**{¶ 38}** The BTA made the separate findings that LMES qualified neither as a "taxpayer" under R.C. 5711.01(B) nor as a "manufacturer" under R.C. 5711.16. The auditor's notice of cross-appeal challenges the latter finding but not the former. The auditor advances an interpretation of the statutes that would make it unnecessary for LMES to have qualified as a "taxpayer" in order to be liable to pay personal property tax if it separately qualified as a "manufacturer." LMES, however, defends the BTA's decision in part by relying on the impact of the BTA's finding that it did not qualify as a "taxpayer" under R.C. 5711.01(B). We decide the merits of the cross-appeal based upon our resolution of these conflicting assertions.

**{¶ 39}** Our review of the statutes persuades us that the auditor is mistaken. The personal-property-tax statutes clearly provide that an entity incurs the obligation to file returns and thereby pay tax based only upon its status as a "taxpayer" as that word is defined in R.C. 5711.01(B).

**{¶ 40}** R.C. 5711.01(B) defines "[t]axpayer" as

any *owner* of taxable property, including property exempt under division (C) of section 5709.01 of the Revised Code, and includes every person residing in, or incorporated or organized by or under the laws of this state, or doing business in this state, or owning or having a beneficial interest in taxable personal property in this state and every fiduciary required by sections 5711.01 to 5711.36 of the Revised Code, to make a return for or on behalf of another.

(Emphasis added.)

{¶ 41} Under the personal-property-listing statutes, the obligation to make returns that report personal property for taxation, along with the obligation to pay the taxes, arises from one's status as a "taxpayer," as indicated by the following examples:

- R.C. 5711.02 (requirement to "make a return" imposed on "each *taxpayer* having taxable personal property with an aggregate value in excess of ten thousand dollars") (emphasis added);

- R.C. 5711.04(A) (authorizing a county auditor to extend the time to make a return "[u]pon verified application of any *taxpayer*") (emphasis added);

- R.C. 5711.24 (the action of assessing personal property for taxation "shall be taken as to taxable property *required* to be listed *in a return*, whether listed or not, and whether such return has been made or not," thereby tying the assessment of the property to the requirement to file a return which, as noted above regarding R.C. 5711.02, is incumbent upon a "taxpayer") (emphasis added);

- R.C. 5711.27 (prohibiting a "taxpayer" from failing to make a required return and authorizing a penalty to be imposed on a "taxpayer" who fails to make a timely return or fails to list a required item on a return);

- R.C. 5711.33(A) (requiring a county treasurer, upon receiving a certificate of a deficiency assessment from a county auditor, to "prepare and mail a tax bill to the *taxpayer* owing such tax," and imposing deadlines for the payment of the tax) (emphasis added);

- R.C. 5719.02 (requiring payment by stated deadlines by "[e]ach person presenting a return for filing for taxation with a county auditor pursuant to sections 5711.01 to 5711.36 of the Revised Code," with the only persons required to present a return being those who qualify as taxpayers).

{¶ 42} We conclude that the obligation to file returns and pay personal property tax is incurred only by those persons who qualify as "taxpayers" pursuant to R.C. 5711.01(B). Thus, the threshold dispositive finding of the BTA is its finding that LMES did not qualify as a taxpayer, a finding to which we now turn.

### b. LMES was not shown to qualify as a "taxpayer" here

{¶ 43} The record establishes that LMES in 1993 did not own *any* property used in business that would have been subject to the Ohio personal property tax. The contract between the DOE and LMES and the testimony presented at the hearing definitively indicated that the federal government, not LMES, owned all tangible personal property at the Piketon plant, including even the pens, pencils, and paperclips. Moreover, pursuant to its special arrangement with the DOE, LMES was a separate entity formed for the sole purpose of carrying out the contract and existed at arm's length from its parent corporation, without assets of its own.

**{¶ 44}** Most significantly, the assessment issued by the auditor relates to personal property that even the auditor concedes was owned by the federal government, not by LMES. Thus, no property owned by LMES appears on the assessment.[4] When an assessment is not based on any property owned by the assessed entity, the assessed entity cannot as a matter of law qualify as a "taxpayer" under the plain wording of R.C. 5711.01(B). It follows that the assessment was unlawful and that cancellation of it was proper.

### 3. *The remaining cross-appeal issues need not be addressed*

**{¶ 45}** Because we resolve the key issue in this case by holding that LMES did not qualify as a "taxpayer" for purposes of Ohio personal-property-tax law, there is no need for us to address the other issues presented in the auditor's cross-appeal. In particular, we decline to address the BTA's finding that LMES did not qualify as a "manufacturer" with respect to the property at issue. Because LMES owned no taxable property, it incurred no personal-property-tax obligations.

### III. CONCLUSION

**{¶ 46}** For the foregoing reasons, we affirm the decision of the BTA.

Decision affirmed.

O'CONNOR, C.J., and O'DONNELL, FRENCH, and O'NEILL, JJ., concur.

LANZINGER, J., concurs in judgment only.

PFEIFER, J., dissents and would dismiss the appeal.

_____

Robert Junk, Pike County Prosecuting Attorney; Kevin L. Shoemaker; Keating, Muething & Klekamp, P.L.L., and William Posey; and Law Office of Sean A. McCarter and Sean A. McCarter, for appellee and cross-appellant.

_____

[4] Ordinarily, an assessment consists of the originally filed return plus any assessment certificates issued later. LMES filed no personal-property-tax return for tax year 1993, so the assessment here consists of the certificate issued by the auditor.

Michael DeWine, Attorney General, and Daniel W. Fausey and Melissa W. Baldwin, Assistant Attorneys General, for appellee and cross-appellee tax commissioner.

Vorys, Sater, Seymour & Pease, L.L.P., Robert E. Tait, Hilary J. Houston, and Steven L. Smiseck, for appellant and cross-appellee.

_____